## A04A1275. PRIME RETAIL DEVELOPMENT, INC. v. MARBURY ENGINEERING COMPANY.

(608 SE2d 534)

PHIPPS, Judge.

Prime Retail Development, Inc. (Prime Retail) sued Marbury Engineering Company, seeking damages for alleged breach of contract, professional negligence, and negligent misrepresentation. Judgment was entered upon the jury's verdict for Marbury. Prime Retail's subsequent motion for new trial was denied. On appeal, Prime Retail challenges the jury's verdict as contrary to the evidence and contends that the court incorrectly charged the jury. Because Prime Retail has demonstrated no reversible error, we affirm.

In May 1998, Prime Retail, a commercial real estate development company owned and operated by James Morton, contracted to purchase certain real estate owned by several members of the Chandler family (hereinafter, "the Chandlers"). Morton recognized that the site had previously been a service station and was concerned about environmental issues. He therefore placed in the sales contract Paragraph 11-C, which pertinently provided,

> Buyer shall be entitled to perform, at Buyer's sole expense, any environmental tests or assessments that Buyer deems appropriate. In the event that such tests and assessments determine that remediation and/or risk assessment is necessary, Seller shall be solely responsible for all costs of any such remediation and/or risk assessment, and the Inspection Period shall be extended until such time as Buyer, Seller, and the governing authority shall agree upon an acceptable remediation or risk assessment plan. Seller shall be entitled to terminate this Agreement, on or before the date that is sixty (60) days after it has been determined that the cost of any remediation shall exceed $100,000.00.

The parties agreed that Prime Retail had until October 5, 1998, to complete its environmental inspection.

After entering into the sales contract, Prime Retail retained Marbury, a civil engineering and land surveying firm, to survey the boundary lines of the property and to complete a "Phase I Audit" on the property before the inspection period expired. Prime Retail's expert engineer explained at trial,

> A Phase I audit is a non-intrusive audit where you just review records, inspect the site, interview people, but you don't take any samples. If, during the Phase I audit, you believe that there could be contamination at the site, if there

is a reasonable expectation that there could be, then it is proper to recommend a Phase II audit. And a Phase II audit is an intrusive audit . . . where you dig holes and take samples and collect groundwater and test the soil and test the groundwater to see if there is contamination.

During the inspection period, Marbury advised Morton that a building owned by the adjacent property owner encroached upon the subject property. As the end of the inspection period drew near, Morton testified, he repeatedly asked Marbury when he would receive the written report of the Phase I Audit; with each query, Marbury told him that the site contained no environmental problems and that it needed only to compile a report. With that verbal assurance, Morton recalled, he mailed a letter to the Chandlers on October 2 notifying them that the property was acceptable and that Prime Retail would proceed with the closing then scheduled in about 30 days, provided that the boundary issue was resolved.

On October 9, Marbury issued a 94-page Phase I Audit report. Morton read only the first nine pages, the executive summary, wherein Marbury opined that "this site does not contain materials that threaten the environmental integrity of the site or the community" and that "a Phase II audit is not required."

The boundary issue was not quickly resolved. Litigation ensued, and closing was extended several times. A tentative settlement was agreed upon in July 1999, but a different agreement that ultimately resolved the matter was not reached until October or November 2000 and not finalized until December 2000.

Meanwhile, in July 1999, Prime Retail assigned its rights under the sales contract with the Chandlers to another company owned by Morton, PRD Properties, LLC. (However, Prime Retail remained obligated for "development costs" of the property.) In September 1999, PRD entered into a contract to sell the subject property to Southeast Development, Inc. (SED) for the construction of a Walgreen's store. That sale, scheduled to be closed in December 1999, was contingent upon SED being satisfied with results from environmental inspections to be completed by September 30.

Because the Phase I Audit on that site was by then almost a year old, SED requested Marbury to conduct a new Phase I Audit, which Marbury completed on September 27, 1999. Contrary to its first report, among other things, Marbury's second report revealed that an abandoned underground oil storage tank remained in place. Most importantly, it recommended a Phase II Audit "to determine the possibility of oil spilled contamination."

At trial, Marbury conceded that in conducting the first Phase I Audit, it committed numerous "mistakes." For example, it had stated

in the executive summary of its original report that "the site was a pecan grove until the existing buildings were built," without also stating that a gas station had been operated on the site. Elsewhere in the audit report, Marbury had expressly stated that the site had not been used as a "gasoline station." And in still another part of that report, Marbury indicated that the site *had* been used as a gasoline station. Marbury also conceded at trial that it had failed to discover and report the presence of an abandoned underground storage tank on the property. It admitted that it had failed to note a fourth vent pipe on the rear of an old gas station building, where only three underground tanks had been removed, and that had the fourth vent been noted, a Phase II Audit would have been recommended at that time. According to Prime Retail's expert engineer, Marbury failed to meet the standard of care in conducting the first Phase I Audit.

Morton did not learn of Marbury's second report until September 29. By then, a Phase II Audit of the site was already underway by another engineering firm, Geosciences, Inc. Morton testified that, if the environmental problems had been reported to him during the inspection period of the sales contract between Prime Retail and the Chandlers, then Paragraph 11-C would have protected Prime Retail; but by September 29, 1999, that provision was no longer effective. Furthermore, Morton claimed, the Chandlers had a lease with the last operator of the gas station, Express Lane, that charged the company with "leaving the property clean and everything, and that survived the terms of the lease. So they were in a lot better shape to deal with Express Lane and had leverage over them. I didn't have any."

Satisfying SED's environmental concerns caused closing to be postponed several times. During the next six months, Geosciences, among other things, completed a Phase II Audit, removed the remaining underground storage tank, prepared a tank closure report, and completed a Corrective Action Plan Part A (CAP A). According to a Geosciences engineer, the Georgia Department of Natural Resources, Environmental Protection Division (EPD), required the last owner/operator of an underground storage tank system to file a CAP A showing information pertaining to certain contaminants at the site "for the State to make a determination of what needs to be done on a property that has had an impact from petroleum contamination."

Morton entered negotiations with Express Lane, seeking to recoup the $50,000 Prime Retail had spent dealing with the environmental issues and ultimately obtaining the tank closure report and CAP A in March 2000. Morton testified that Express Lane was required to file those reports to fulfill its obligation to the EPD, and thus he offered them to Express Lane and asked it to reimburse him what he had spent. Express Lane counter-offered to pay Prime Retail

approximately $18,000. By October 2000, Morton explained, he was heavily invested in the property and thus "caved in," accepting Express Lane's counteroffer and providing it the reports. That same month, Express Lane filed a CAP A with the EPD. Prime Retail's attorney testified that, in addition,

> Express Lane agreed to pick up the remediation from this point forward, to provide all of the testing and go forward and satisfy the State EPD on the environmental condition of the property, and to reimburse Prime Retail for some of the monies that they had expended to get it to examine the environmental condition of the property that they agreed to reimburse Mr. Morton for — not all of it, but some of it.

In December 2000, the closings occurred. PRD purchased the land from the Chandlers for $625,000 and simultaneously sold it to SED for $1,800,000. Morton testified that, with regard to the latter closing, PRD disbursed to Prime Retail approximately $250,000, which represented the amount Prime Retail then had invested in the property. Also that month, the Chandlers assigned to PRD all of their claims against Express Lane with respect to the environmental contamination of the property.

According to Morton, Express Lane was a participant of the Georgia Underground Storage Tank Fund and thus had $1,000,000 (less a $10,000 deductible) of coverage for corrective actions related to releases arising from operating an underground storage tank.[1] Evidence was adduced that Express Lane had requested $96,836 to resolve the environmental problems at the site and that it had been approved to receive $86,836. There was also evidence that, in 2002, Express Lane paid Prime Retail an additional $15,000.

While Marbury admitted that it committed errors in conducting and reporting on the original Phase I Audit, it asserted the affirmative defenses of contributory and comparative negligence. In addition, Marbury claimed that its errors had not caused Prime Retail to suffer any actual damages.

1. Prime Retail contends that the trial court erred in charging the jury on contributory and comparative negligence.[2] It argues that those defenses are inapplicable against claims of breach of contract, professional negligence, and negligent misrepresentation. Prime Retail also argues that the evidence did not authorize such charges,

---

[1] See OCGA § 12-13-1 et seq.; see generally *Luke v. Dept. of Natural Resources*, 270 Ga. 647 (513 SE2d 728) (1999).

[2] See *DeVooght v. Hobbs*, 265 Ga. App. 329, 333 (2) (b) (593 SE2d 868) (2004) (citing OCGA § 51-11-7).

pointing out that it had played no part in causing the errors committed by Marbury during its first Phase I Audit.

Prime Retail's contention that the affirmative defenses of contributory negligence and comparative negligence are inapplicable against claims of professional negligence and negligent misrepresentation is contrary to law.[3] And the record shows that the court prefaced the complained-of charges with an instruction that the charges to follow applied only to the claims of professional negligence and negligent misrepresentation.

In requesting a charge on comparative negligence, counsel for Marbury cited evidence that Morton had elected to proceed to closing without having seen a report from Marbury's Phase I Audit and that when Morton eventually received a report, he read only the first nine pages. Counsel claimed that if Morton, who knew that the property had been used as a service station, had read the report in its entirety, the discrepancies concerning the site's prior uses would have alerted him that the audit findings were unreliable.

However, the undisputed evidence showed that Morton did not rely on Marbury's erroneous written report in deciding to go forward with the purchase of the Chandlers' real estate. Rather than insisting that Marbury timely provide Prime Retail with a written report to examine or seeking from the Chandlers additional time to fully complete an environmental inspection, Morton made the decision to close based only on Marbury's verbal claims that the property contained no environmental problems. Morton notified the Chandlers that the property was environmentally acceptable days before Marbury presented him with a written report. It was for the jury to decide whether proceeding to closing without having examined a written environmental report amounted to negligence.

A trial court has a duty to charge the jury on the law applicable to issues that are supported by the evidence.[4] Where there is slight evidence on a specific issue, it is not error for the court to charge the jury on the law related to that issue.[5] As there was some evidence of negligence on the part of Prime Retail, the court did not err in

---

[3] *First Bancorp Mtg. Corp. v. Giddens*, 251 Ga. App. 676, 680 (5) (555 SE2d 53) (2001) ("defenses of contributory and comparative negligence when supported by evidence may be raised in a professional malpractice case"); see generally *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997) (elements of negligent misrepresentation include reasonable reliance on the false information); *Marquis Towers v. Highland Group*, 265 Ga. App. 343, 347 (2) (593 SE2d 903) (2004) ("[m]isrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence") (punctuation and footnote omitted).

[4] *Thrash v. Rahn*, 249 Ga. App. 351 (1) (547 SE2d 694) (2001).

[5] Id. at 352.

charging the jury on comparative negligence.[6]

2. Prime Retail contends that the trial court erred in denying its motion for new trial, arguing that the evidence demanded a verdict in its favor. It claims that,

> Under the transaction between Prime Retail and its commonly-owned affiliate, PRD, Prime Retail remained obligated for and paid for "development costs" of the property, and thus incurred the expenses associated with the environmental risk assessment (Phase II) and remediation (CAP A). The costs of those to the Plaintiff were $7,500.00 for the Phase II and not less than $17,000.00 for the CAP A.

Prime Retail argues that the evidence showed that Marbury failed to identify and report pertinent environmental issues during its initial Phase I Audit, that such failure caused it to expend a minimum of $24,500,[7] and that if Marbury had timely identified and reported the environmental problems, these expenditures would have been the Chandlers' responsibility, pursuant to Paragraph 11-C of Prime Retail's sales contract with the Chandlers.

Marbury counters that those expenses were not covered by that contract because it expressly provided that (1) Prime Retail was solely responsible for the costs of "any environmental tests or assessments that [it] deem[ed] appropriate"; and (2) as testified to by one of the Chandlers, their contractual obligation with regard to environmental issues was limited to the costs of necessary "remediation or risk assessment" up to $100,000. Marbury cites the testimony of SED's environmental attorney that none of the activities performed at the site could properly be categorized as "remediation or risk assessment."

Furthermore, there was evidence that PRD had received an assignment of all of the Chandlers' claims against Express Lane for environmental contamination of the property. Thus, whatever "leverage" Morton claimed had been available only to the Chandlers was then available to him, as owner of PRD.

---

[6] See generally *Palo v. Meisenheimer*, 199 Ga. App. 24-25 (2) (403 SE2d 881) (1991).

[7] Prime Retail further asserts in its brief, "Various other damages claims were also presented to the jury. At trial, the Plaintiff also proved losses of attorney's fees to resolve the environmental issues, fees for environmental services (in addition to the Phase II and CAP A), lost profits, lost interest and expenses of litigation." But in contravention of Court of Appeals Rule 27 (a) (1), it provided no citation to the record to support its claim. Consequently, Prime Retail has waived consideration of this part of its claim of error. "It is not the function of this court to cull the record on behalf of a party in search of instances of error." (Citation, punctuation and footnote omitted.) *Rice v. Baker*, 264 Ga. App. 704, 705 (2) (592 SE2d 186) (2003).

Marbury further asserts that Prime Retail suffered no actual damages. It points to evidence that Express Lane had already paid Prime Retail more than $24,500 ($18,000 for the tank closure report and the CAP A plus $15,000 reimbursement paid in 2000).[8] Also, there was evidence that, coincident with the closings, PRD disbursed to Prime Retail approximately $250,000, which Morton testified represented the amount Prime Retail had invested in the property by that time. In addition, there was evidence that Express Lane had assumed full responsibility for the site's environmental problems, beginning with filing the CAP A, and that Express Lane would be reimbursed for all of its expenses less $10,000.

Moreover, there was evidence authorizing the jury to find that negligence on the part of Prime Retail was equally or more responsible for its injury than any of Marbury's acts or omissions.

> The standard for appellate review is clear: The appellate court will not disturb the trial court's refusal to grant a new trial if there is any evidence at all to support the verdict, however slight, and regardless of what may be the character of the witnesses. Our function is to review the sufficiency of the evidence, and not to determine its weight. Though the evidence might have authorized a different verdict or the verdict is supported by only slight evidence or the evidence is conflicting or preponderates against the verdict, where no material error of law appears, the court will not disturb the trial judge's judgment in overruling the motion for new trial.[9]

As there was some evidence supporting the jury's verdict, we will not disturb the trial court's judgment overruling the motion for new trial on the general grounds.[10]

3. Prime Retail contends that the trial court erred in failing to charge the jury that Marbury, as the defendant, had the burden of proving its affirmative defenses.

Prime Retail failed to object to the trial court's charge on this basis. That failure constitutes waiver.[11] Nonetheless, in its reply brief, Prime Retail cites OCGA § 5-5-24 (c) and contends that there

---

[8] Prime Retail makes no argument in its appellate brief concerning the collateral source rule. But see generally *Amalgamated Transit Union Local 1324 v. Roberts*, 263 Ga. 405, 409 (2) (434 SE2d 450) (1993) (collateral source evidence may be admitted in breach of contract cases if relevant to demonstrate extent of plaintiff's actual loss that was caused by the breach).

[9] (Citation omitted.) *Henderson v. Yokley*, 265 Ga. App. 445-446 (1) (594 SE2d 391) (2004).

[10] See OCGA § 51-11-7; *DeVooght*, supra.

[11] *Strickland v. Dept. of Transp.*, 196 Ga. App. 322, 323 (3) (396 SE2d 21) (1990).

was no waiver because the error was substantial and harmful as a matter of law.

To constitute harmful error within the meaning of OCGA § 5-5-24 (c), an erroneous charge or failure to charge must result in a gross injustice, such as to raise a question whether the appellant has been deprived of a fair trial.[12] Contrary to Prime Retail's assertion, we find no such error in this case.

*Judgment affirmed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED NOVEMBER 19, 2004.

*Donaldson, Bell & Pickett, Mark L. Pickett*, for appellant.
*Wasson, Sours & Harris, W. Hensell Harris, Jr., Gardner, Willis, Sweat & Goldsmith, Donald A. Sweat*, for appellee.

---

[12] *Adams v. MARTA*, 246 Ga. App. 698, 699 (1) (a) (542 SE2d 130) (2000).